**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Samuel Bowen | : | 3:03CV0400(CFD) |
| v. | : | |
| John Armstrong, et al | : | October 20, 2004 |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. The defendants Strange and Levestre were Wardens of facilities in which the plaintiff was housed. Gaudet is alleged to have been the "Unit Manager" at Osborn Correctional Institution. **Comp. ¶ 5.**

2. The defendant Dr. Serafini treated the plaintiff for a few months while he was housed at Willard-Cybulski Correctional Institution (hereinafter "Willard"). **Exs. A; E.**

3. Department of Correction records indicate the plaintiff's most recent period of incarceration commenced on June 16, 2000 and ended May 24, 2002. **Ex. A.**

4. At the beginning of his final period of incarceration, the plaintiff was given a full eye exam at "UConn" the University of Connecticut Health Center. **Ex. B 33-34.** The plaintiff was informed then that his optic nerve in his left eye had suffered severe damage. **Ex. B 33-34.** The plaintiff was also told at this time that the pressure within his left eye was too high for surgery to be performed at that time. **Ex. B 92.**

5. The plaintiff was informed that surgery was risky. **Ex. B 113.**

6. The pressure in the plaintiff's left eye continued to increase during his final period of incarceration. **Ex. B 113-14.** The plaintiff testifies that he was told that the pain and difficulty seeing in his left eye was due to elevated pressure. "They told me it was the pressure up around there that was swelling." **Ex. B 115.**

7. According to the plaintiff's own testimony, the pressure in his left eye never went down as far as the doctors wanted it to. "[T]he doctor in UConn would tell me the pressure went down, because he was keeping records of my pressure up and down. You know, he was keeping a record. So he would tell me – sometimes I go there, he would say, Well, it went down some, Sam. *It should go down a little bit more."* **Ex. B 119-20.** The plaintiff testified as follows: "Q: So the eyedrops weren't really helping the pressure in your eye go down? A: No. …. Q: So you think the pressure stayed high in your eye? A: yes." **Ex. B 123.**

8. The plaintiff claims that he always took his eyedrops, but admits that medical care providers claimed he did not comply with his eye drop medication regimen while incarcerated. **Ex. B 121, 46.**

9. The plaintiff testified as follows:

And I told him to his face, This is a lie. He said that I lost my eyesight because I wasn't taking my medications like I was supposed to. That was a lie. What medication? All they was giving me for my eye was eyedrops. Was eyedrops. An eye drop is not medication for an optical nerve injury.

**Ex. B 46.**

10. The plaintiff repeated that he does not consider eye drops to be medical treatment. **Ex. B 55-56.** The plaintiff testified that at one point he went two weeks without his eyedrops but that during that two week period he received "a substitute eye drop...So I don't know what difference it would make anyway." **Ex. B 121.**

11. The plaintiff testified that it seemed like Dr. Serafini was trying to help him. **Ex. B 116.**

12. The plaintiff testified that the defendant Gaudet told him that as he wasn't a doctor, there wasn't anything he could do. **Ex. B 37.** The plaintiff does not claim that

defendant Gaudet had any control over the medical care he received. The plaintiff does not claim that Gaudet in any way prohibited the plaintiff from making his medical appointments.

13. The plaintiff also claims he wrote letters to Warden Strange but did not produce any. **Ex. C Plaintiff's Response to Defendants' Interrogatories and Requests for Production; see also Ex. B, p. 78, request to plaintiff's counsel.** The plaintiff admits that he saw medical frequently while housed at Osborn. **Ex. B**.[1]

14. The plaintiff does not claim that Warden Strange had any control over the medical care he received. The plaintiff does not claim that Warden Strange in any way prohibited the plaintiff from making his medical appointments.

15. Warden Levestre, at one point the Warden of the Willard facility, was only the Warden for the plaintiff from late April 2001 until late July 2001. During this period of time, the plaintiff saw medical personnel, including Dr. Serafini, on numerous occasions. **Exs. A; D.**

16. There is no allegation Levestre ever impeded the plaintiff's ability to obtain medical care in any way.

17. As to his right eye which was functional at the time of plaintiff's deposition, the plaintiff testified that while incarcerated, he received eye drops for his right eye and that this preserved his right eye. **Ex. D DOC Medical Records 10-11, 119.** He testified that he saw a doctor upon his release who informed him that his right eye also has glaucoma and told him that "laser surgery can *sometimes* open, can work on it." **Ex. D 25.**

---

[1] Here is a list of plaintiff's references to receiving medical care while at Osborn as contained in his deposition: 1) "I got the glasses while I was incarcerated at Osborn." **Ex. B 32;** 2) "I was told by the doctors at the Osborn facility that they would have to send me to UConn." **Ex. B 33;** 3) He saw Dr. Smyth when at Osborn. **Ex. B 82;** 4) Osborn

18. The plaintiff has not had surgery for either eye, although he has been discharged for over two years. **Ex. D 25-26.** The plaintiff has never had surgery to "reverse" the damage to his left eye. **Ex. D 25-26.** He was given eyedrops after his release for the right eye, and he took them until the first bottle ran out, but no longer takes them. **Ex. D 26.** This is despite the fact that the doctor who the plaintiff saw after his release told him that "as long as he keeps it wet" his right eye may not get any worse, and that laser surgery might only be a "possibility." **Ex. D 29.**

19. The parties agree that the plaintiff most recently entered Department of Correction custody on June 16, 2000. Comp. ¶ 10. The plaintiff had been incarcerated before that, from April of 2000 until June 7, 2000, as well as on previous occasions. **Ex. A**. Despite the plaintiff's claim that he had never heard the word glaucoma in his life before his most recent incarceration, there are several references in his DOC medical chart to previous diagnoses.[2]

20. The plaintiff was incarcerated on various occasions in 1999. **Ex. A**. At an intake screening on March 1, 1999, the plaintiff an intake nurse at NHCC noted in the plaintiff's medical chart that he had "[increasing] blurred vision L eye. wears no glasses. told 1 yr. ago diag. [diagnosed] c/ [with] Glaucoma and takes no meds." **Ex. D 42.**

21. On March 3, 1999, the plaintiff signed an Authorization form for release of medical information to the Hospital of St. Raphael's Eye Clinic. **Ex. D 149.** The plaintiff initialed a line that states "Eye Clinic (Glaucoma)". **149.** His signature on the bottom of the form is witnessed. **Ex. D 149.**

---

doctors did send him to UConn more than once. **Ex. B 91; see also Ex. B at 98, 112, 113, 117.** References to frequent medical care are replete in the medical records. **Ex. D.**

22. On March 1, 1999, a nurse at NHCC made a note in the plaintiff's chart that his Intake had been completed. **Ex. D 251.** In addition to various other issues, the nurse noted that the plaintiff had been put on Dilantin for another condition and had not taken the medicine for a year. **Ex. D 251.** She then noted, "He c/o [complains of] [increasing] blurred vision L eye and diagnosed c/ [with] glaucoma 1 yr. ago + was given script and return appt. and never filled or return for appt." **Ex. D 251.**

23. As **Exhibit A** indicates, the plaintiff was in and out of DOC custody in the 1999. He entered custody on January 22, 1999 and was discharged to bond three days later. **Ex. A**. He was not held from the end of January 1999 until March 1, 1999, when he was reincarcerated for two weeks until March 15, 1999. **Ex. A**. He then spent 2 ½ months on his own, re-entering custody on June 30, 1999, and staying again for only a couple of weeks. **Ex. A.**

24. The plaintiff was readmitted in November of 1999, and this time stayed until February of 2000. **Ex. A**. In April of 2000 he was again placed in custody, where he stayed until June 7, 2000. **Ex. A**. He was released then until June 16, 2000 when his final period of incarceration began. **Ex. A**. The comings and goings of plaintiff prior to his final incarceration created inherent difficulties for the plaintiff in a regular course of care by persons providing care to inmates.

25. The earliest reference to glaucoma in the plaintiff's medical chart is in 1996 when the plaintiff was not incarcerated and went to the Emergency Room at the Hospital of St. Raphael complaining of blurry vision in his left eye. **Ex. D 164-68.** In a record included in the chart dated November 2, 1996, the plaintiff complained of "Lt Eye Pain". **Ex. D 164.** He

---

² Despite defendants' requesting "outside" medical records, the plaintiff has not yet

reported "2-3 days dull pain L eye assoc. c/ some blurring of vision and halos around lights. Denies prev[ious] vis[ion] problems. No glasses. Denies trauma." The physician's assessment was "? incipient [just beginning] glaucoma" **Ex. D 165.**

26. The patient was instructed to see an "opthamal[ogist] in am." **Ex. D 165.** The discharge summary indicated that the patient was "Discharged by MD/PA With MD/PA Instructions." **Ex. D 168.**

27. The plaintiff's medical chart includes a Utilization Review Request dated May 8, 2000 and faxed on May 15, 2000 by a Dr. Arnista at NHCC. **Ex. D 152.** The request is for the plaintiff to receive an ophthalmology consult. **Ex. D 152.** The request states, "Patient seen for an exam. Been told (@ Yale) of glaucoma, with ? laser or surgical treatment recommended. Exam revealed severe optic nerve damage." **Ex. D 152.**

28. The chart includes a facsimile transmission report dated 5/15/00 to "URC-Denise". **Ex. D 154.** Dr, Arnista's notes also state on May 8, 2000 "Glaucoma—surgery or laser recommended (@ Yale) pt [patient] didn't follow up." **Ex. D 153.** These notes are important as they precede the plaintiff's final period of incarceration. **Ex. A.**

29. Since the mid-90s, the University of Connecticut Health Center "UCHC" has contracted with the Department of Correction to provide healthcare for persons within the custody of the Commissioner of Correction. **Ex. E, Serafini Aff.** UCHC created "Correctional Managed Health Care" as the entity responsible for providing direct care to inmates. **Ex. E**. Correctional Managed Health Care has established a "Utilization Review Committee". **Ex. E.**

provided any to defendants.

30.     In order for an inmate to receive a consultation with a medical care provider outside the facility in which he is housed, or to receive certain procedures such as surgery, the Utilization Review Committee ("URC") must approve care proposed by an on-site physician. **Ex. E**. An opthamology consult for an inmate requires approval by the URC, as would any eye surgery. **Ex. E**.

31.     If URC denies treatment, a doctor cannot override URC's decision. **Ex. E**. Custodial staff, such as Wardens and Correctional Counselors, have no input into the URC decision-making process as they are not qualified medical professionals. **Ex. E**. URC is a committee made up solely of licensed healthcare practitioners. **Ex. E**. Dr. Serafini was never on the Utilization Review Committee during the plaintiff's final period of incarceration. **Ex. E**.

32.     As noted above, the plaintiff entered Department of Correction custody for the final time on June 16, 2000. **Ex. A**. He was admitted to NHCC for about three weeks, and then transferred to Osborn, where he stayed from July of 2000 until April of 2001. **Ex. A**. In early August of 2000, the plaintiff saw an optometrist at Osborn, Dr. J. Smyth. **Ex. D 197.**

33.     Dr. Smyth completed a request to the "URC" or "Utilization Review Committee" on August 7, 2000. **Ex. D 196-97, 203.** The request indicated that the plaintiff was "not currently being treated" for glaucoma. **Ex. D 196.**

34.     URC approved the request on August 11, 2000, and Dr. Pillai, M.D. noted the action required, which was transportation to "UCHC OPD". **Ex. D 196.** The Committee instructed "Please send YNHH [Yale New Haven Hospital] records with patient at time of visit."

**Ex. D 196.** The plaintiff saw a Dr. Jeanine Suchecki[3] in the Opthamology Department at UConn on September 12, 2000. **Ex. D 189.**

35. Dr. Suchecki stated, "Disc'd options. Needs follow up 2 mo." **Ex. D 189.** Dr. Suchecki diagnosed the plaintiff at this time with "advanced glaucoma." **Ex. D 189.** Dr. Suchecki recommended two kinds of eyedrops to be taken twice daily. **Ex. D 189.**

36. Pharmacy records indicate that Dr. Pillai, the on-site physician, then prescribed two kinds of eyedrops for the plaintiff in a prescription lasting from September 14, 2000 until November 12, 2000. **Ex. D 19.** The optometrist, Dr. Smyth, followed up with the plaintiff on October 27, 2000. **Ex. D 238.** She noted "pressures better but still unsatisfactory. *Discussed patient compliance with drops in AM."* **Ex. D 238 (emphasis added).**

37. There is no indication in the medical records that the plaintiff received his 2 month follow-up visit, which would have been in November of 2000 while the plaintiff was at Osborn. A reminder was faxed to URC on October 26, 2000 regarding the requested follow-up visit, but no response from URC is indicated. **Ex. D 237.**

38. While it is not clear why this follow-up did not occur, there is no indication that at this point in time, November 2000, that either Dr. Serafini or any of the other three defendants were even remotely aware of the plaintiff's eye condition. Dr. Serafini had not yet seen the plaintiff, and there is no indication the plaintiff was sufficiently concerned at this time that he was seeking help from any source regarding his eyesight. Dr. Pillai was the doctor following the plaintiff's general care while he was incarcerated at Osborn. **Ex. E**. Moreover, even had they

---

[3] The plaintiff seems to confuse Dr. Suchecki at UConn with Dr. Serafini who treated him on-site at Willard. **Exs. A; B; D; E.**

wanted to, none of the defendants could authorize care at UConn; only URC could do so. **Ex. E.**

39. The following month, December of 2000, "Debbie CHN [Correctional Head Nurse] noted that a follow-up was required for the plaintiff to see an ophthalmologist regarding his glaucoma. **Ex. D 191.** It was noted that this follow-up was "booked." **Ex. D 191.** Dr. Pillai saw the plaintiff on December 11, 2000, and advised him to continue the two eye drop medications. **Ex. E 237.**

40. In another month, January of 2001, the plaintiff still had not had his follow-up, and so the optometrist, Dr. Smyth, filed a Utilization Review Request, noting: "58 y o black male with advanced glaucoma. Last seen by opthamology 9-12-00 with a 2 month follow-up needed. Has not had 2 month follow-up visit—Follow-up necessary." **Ex. D 200.**

41. It was noted in the Clinical Record on January 5, 2001, "MD to write URC for follow-up opthal. Appt. Will book for Dr. Smyth for eval." **Ex. D 237.**

42. Dr. Pillai filed URC requests for an opthamology consult on January 16, 2001 as well as January 8, 2001. **Ex. D 186, 202.** Both were denied with instruction to Dr. Pillai to refer the patient to Dr. Smyth and to note the patient's history of medication compliance. **Ex. D 186, 202.**

43. Dr. Smyth filed another request a week later noting the results of her optometry exam and stating, "Pt [patient] c/o [complains of] almost complete loss of vision OS [left eye]." **Ex. D 185.** This request was approved. **Ex. D 185.** Dr. Smyth noted that the medication prescriptions had been renewed. **Ex. D 185.**

44.     For a reason not apparent in the record, the opthamology appointment was not conducted until April of 2001, which was still before the plaintiff was transferred to the Willard facility.  **Ex. D.**  This was before Dr. Serafini treated or examined the plaintiff for any purpose and before any correspondence to any custodial defendant the plaintiff has produced.  **Exs. A; B 178-80**; **C.**

45.     Indeed, in April 2001, the plaintiff asked to see a medical supervisor not with regard to treatment for his eyes but for the purpose of seeking a reduction in his Medical Treatment Needs Score in the DOC classification system.  **Ex. D 156.**  This reduction was denied given the plaintiff's extensive medical history, including the fact that the plaintiff was "followed by UConn" for his glaucoma.  **Ex. D 156.**

46.     When the plaintiff was seen by the UConn ophthalmologist on April 17, 2001, before his transfer to Willard, the specialist, again Dr. Suchecki, determined that the plaintiff was not taking his eyedrops properly.  **Ex. D 178-80; 340.**

47.     The plaintiff's "IOP", intraocular pressure, was "too high".  **Ex. D 340.**  The plaintiff's eye drop prescription was adjusted and a two-month follow-up was planned.  **Ex. D 340.**  As the plaintiff was still at Osborn, Dr. Pillai reviewed and signed the treatment plan.  **Ex. D 340.**

48.     Within days of seeing the plaintiff, Dr. Suchecki completed a URC request seeking a two-month follow-up for the plaintiff.  **Ex. D 178-80.**  URC's response was directed to Dr. Pillai: "Dr. Pilai to refer to on-site optometrist for f/u [follow-up]. Also, increase medical

monitoring of compliance with glaucoma meds (patient not using appropriately per ophthalmologist.)" **Ex. D 178-80.** [4]

49. This response from URC was noted by Dr. Pillai on May 4, 2001, a few days after the plaintiff was transferred to Willard on April 30, 2001. **Exs. A; B 179.** URC was notified of the plaintiff's transfer to Willard on or near May 1, 2001. **Ex. D 36.** Also on May 1, 1001, a nurse noted in the chart "Request for opthamology Cl[inic] faxed to URC." **Ex. D 228.**

50. Dr. Serafini reviewed the plaintiff's chart on May 22, 2001, signing off on the URC response on that date. **Ex. D 178.** Dr. Serafini noted in the chart that he had reviewed the URC orders on May 22, 2001. **Ex. D 228.**

51. This is the first time that Dr. Serafini had any contact with the plaintiff or his case. **Ex. D**. Eight days later, on June 1, 2001, Dr. Serafini examined the plaintiff. **Ex. D 228.** On this date, Dr. Serafini reviewed the plaintiff's medication compliance with him. **Ex. D 228.**

52. Also on this date, Dr. Serafini noted that the "Plan" for the plaintiff was to follow up with opthamology. **Ex. D 228.** At this time, Dr. Serafini estimated the plaintiff's vision to be almost completely gone in notes made on the left side of the chart. **Exs. B p. 228; E.** Dr. Serafini also noted at the time that the glaucoma was several years old and that there were no changes since April of 2001. **Exs. B 228; E.**

53. At the time the plaintiff was due for his opthamology follow-up as per the ophthalmologist, Dr. Serafini re-submitted the URC request previously submitted by Dr. Suchecki for the opthamology clinic appointment. **Ex. D 17, 177, 357.** Dr. Serafini faxed to

---

[4] The plaintiff had compliance issues with other medications as well. **See, e.g. Ex. D 161.**

11

URC an optometry report indicating the plaintiff was reporting his compliance with the medication regime. **Ex. D 356.** This request was again denied. **Ex. D 177, 360.**

54. The URC referred the patient to the facility optometry clinic at Osborn on June 21, 2001, essentially denying the request for an opthamology exam. **Ex. D 177.** On July 17, 2001, the plaintiff was transferred back to Osborn for a week period before being sent back to Willard on July 24, 2001. **Ex. A**. Osborn has a more extensive medical unit. **Ex. E**. The plaintiff had fallen and was sent for evaluation and monitoring. **Ex. D 225, 228, 281-83.**

55. A week after that, the plaintiff was again transferred, this time to Gates Correctional Institution ("Gates"). **Ex. A.**[5] The Medical Transfer Summary form completed on July 30, 2001, indicates that another URC request for an UConn opthamology was sent in July, 2001. **Ex. D 35.** When the plaintiff arrived at Gates, it was noted in his chart that he "denie[d] any acute medical or MH [mental health] issues a this time." **Ex. D 35.**

56. The plaintiff was back at Osborn on July 17, 2001 when Dr. Pillai filed an additional URC request for an opthamology follow-up with attachments. **Ex. D 351.** Dr. Pillai filed another URC request with attachments on July 18, 2001. **Ex. D 17, 352-54.**

57. Dr. Pillai also ordered an optometry appointment for the plaintiff at this time and prescribed a four month supply of eyedrops for the plaintiff. **Ex. D 16.**

58. Dr. Serafini again saw the plaintiff at Willard and again submitted a URC request for opthamology care for the plaintiff on July 27, 2001. **Ex. D 181-83, 224.** Dr. Serafini noted that the plaintiff had been seen by optometry as per URC's last instruction. **Ex. D 183.**

---

[5] Gates is a low security level facility where inmates are often transferred in the period leading up to their discharge from prison. **Ex. E**.

59.     . Dr. Serafini marked this request "Urgent" and circled the work "urgent." **Ex. D 183.** This request was also denied, but the denial went to Gates, as the plaintiff had been transferred there. **Ex. D 349.** Dr. Serafini was not assigned to Gates at that time. **Ex. E**.

60.     On July 31, 2001, a nurse at Gates saw the plaintiff and took a health history from him, noting that he was on medications for glaucoma. **Ex. D 49, 221.** The nurse referred the plaintiff the plaintiff to the optometry clinic. **Ex. D 221.** She noted, "URC request was faxed from previous facility for UConn opthamology. Will place eye gtts [drops] on line as previous facility stated I/M inmate was non-compliant." **Ex. D 221.**

61.     The nurse's note on July 31, 2001 at Gates makes clear that Dr. Serafini was no longer responsible for the plaintiff's overall medical care: "Case was discussed c/ Dr. Wagner and Charge Nurse who will contact URC for disposition of this urgent request." **Ex. D 221.** A different doctor ordered additional eyedrops on July, 31, 2001**. Ex. D  12.**

62.     At Gates, the plaintiff suddenly suffered a cardiac episode and was sent to Lawrence and Memorial Hospital from August 9 through August 13, 2001. **Exs. A; B 98-145, 292.** The last time Dr. Serafini had any part in the plaintiff's health care was the URC request in late July, 2001. **Ex. D 305.**

63.     The plaintiff transferred out of Willard on July 30, 2001 and never returned. **Ex. A.** Obviously, other doctors continued to see the plaintiff for various issues and to prescribe medication. **Ex. D 10, 301-03, 306, 308-09, 311, 350, 386-95, 406-409.**

64.     After his hospital stay, the plaintiff was returned to Osborn for the remainder of his incarceration until May 2002. **Ex. A**. As stated above the defendant, Dr. Serafini, was not responsible for patients at the Osborn. **Ex. E.** The plaintiff was at Willard only a short period of

13

time, and during that time, Dr. Serafini made several efforts to help the plaintiff, making URC requests on a repeated basis. **Ex. E.**

65.     Upon his return to Osborn from the hospital after his cardiac incident, the plaintiff was initially housed in a medical ward, "Ward 9" so that his cardiovascular function could be monitored. **Ex. D 215.** At this point, the primary focus of the plaintiff's medical care shifted to his cardiac well-being. **Ex. D 209-215, 346-47.** The plaintiff was not compliant with the monitoring and care recommended for his heart. **Ex. D 209, 212-13.**

66.     The plaintiff was continued on eyedrops through November. **Ex. D 309, 310, 313.** In November, the plaintiff indicated he had run out of eye drops and more were ordered. **Ex. D 302, 350, 395.**

67.     The plaintiff saw the optometrist in both November and December of 2001. **Ex. D 395.** In December of 2001, the plaintiff was admitted to the infirmary at Osborn for back pain after a fall in the dining hall. **Ex. D 401.**

68.     On December 15, 2001, it was noted that the plaintiff's left eye was slow to react to light. **Ex. D 9.** He was also seen several times in December by Mental Health staff for various issues, none of which were his deteriorating eyesight. **Ex. D 405.** Dr. Pillai and Dr. Smyth continued the plaintiff's medications. **Ex. D 407-408, 410.**

69.     In January of 2002, the plaintiff was back in general population and reported "sudden onset" loss of vision in his left eye. **Ex. D 343, 390.** It was at this point that a family member got involved. **Ex. D 393, 6.** It is not until this point, after the plaintiff perceived his left eyesight to be gone, that medical records reflect the plaintiff became very concerned about his right eyesight remaining. **Ex. D 393, 7, 8.**

70.     The plaintiff then saw Dr. Smyth, who requested an opthamology evaluation to control the pressure and preserve the vision "OD", that is, in the patient's right eye. **Ex. D 343.** The plaintiff's "almost total loss of vision" was confirmed in the left eye, but had been noted as such in the left eye on previous dates. **Ex. D 344, 185.**

71.     .   When Dr. Smyth did a URC request in January of 2002, URC noted in its response that the patient was reporting almost total loss of vision, but "URC notes loss of vision OS [left eye] since 1/01 per UR data." **Ex. D 342.**   Nonetheless, URC approved the visit to an opthamologist. **Ex. D 342.**

72.     The plaintiff saw an opthamologist, Dr. Ehlen, on February 27, 2002. **Ex. D 335.** A return visit to the opthamologist was approved by URC in March of 2002. **Ex. D 335-37.** The day after the plaintiff saw the opthamologist at UConn, he reported to a nurse, "I just wanted to let you know the end of the story. I'm 100% blind in this eye and *the pressure is too high in this eye for laser surgery."* **Ex. D 391** (emphasis added).

73.     The plaintiff was seen by medical staff in five times in January and February, in March of 2002, and three times in April of 2002**. Ex. D 39**1.  It was in February of 2002 that the plaintiff reported to medical staff that he "Has written to everyone possible—anxiously awaiting a trip to UConn, worried about the status of his *R* eye." **Ex. D 392 (emphasis added).**

74.     The plaintiff was seen again by an opthamologist in April, who recommended a specialist evaluation at Yale New Haven Hospital. **Ex. D 328**.  Vision tests were conducted on the plaintiff in May of 2002, shortly before his discharge that month. **Exs. B 329-30; A**.

75.     Dr. Blanchette offers the following opinion, after reviewing the plaintiff's medical records:

15

> Given the intraocular pressure in the plaintiff's left eye, given the advanced stage of the glaucoma, and given the irreversible damage to the optical nerve, either traditional or laser surgery to treat the plaintiff's glaucoma during his last period of incarceration would have been unsuccessful. The attendant risks of the surgery would have outweighed any potential benefit.

**Ex. F.**

76.    Wardens Levestre and Strange and Counselor Gaudet, who are undisputedly custodial rather than medical personnel, were responsible, within the scope of their duties, for custodial duties related to the plaintiff. They were not, however, overseeing his medical care nor were they personally involved in it.

DEFENDANTS,
DR SERAFINI ET AL
RICHARDBLUMENTHAL
ATTORNEY GENERAL


BY:__/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us


## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this 20th day of October 2004:

John Williams, Esq.
Williams & Pattis
51 Elm St., Suite 409
New Haven, CT
06510


__/s/_____
Lynn D. Wittenbrink
Assistant Attorney General