# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Samuel Bowen                              :          3:03CV0400(CFD)
    v.                                    :

John Armstrong, et al                     :          October 20, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants in the above-captioned matter move for summary judgment in their favor.  The plaintiff's action is insufficient as a matter of law and it is not possible for the plaintiff to present admissible evidence that the four named defendants in this action exhibited deliberate indifference.  Moreover, even assuming for the sake of argument that the plaintiff can demonstrate a constitutional violation, the defendants were not sufficiently personally involved.  Moreover, all of the defendants in this matter are entitled to qualified immunity.

## I.    BACKGROUND AND FACTS

The plaintiff claims that the four defendants, one doctor and three custodial correctional officials, stood by and did nothing when it was clear to them that the plaintiff was going blind and that the blindness could have been prevented.  The undisputed facts, as set forth herein, demonstrate, however, that despite the plaintiff's conclusory allegations, the blindness in the plaintiff's left eye could not have been prevented.  Even if the blindness in a single eye could have been prevented, none of the defendants exhibited deliberate indifference or were sufficiently personally involved in any constitutional violation.  Moreover, all of the defendants are entitled to qualified immunity as a matter of law given the undisputed facts of this matter.

**A.    <u>Plaintiff's Complaint</u>**

The plaintiff, a former inmate, brings this action against four defendants:  Mark Strange, "Unit Manager Gaudet," Nelvin Levestre, and Dr. Fred Serafini.  The defendants Strange and Levestre were Wardens of facilities in which the plaintiff was housed.  Gaudet is alleged to have been the "Unit Manager" at Osborn Correctional Institution.  Comp. ¶ 5.  The defendant Dr. Serafini treated the plaintiff for a few months while he was housed at Willard-Cybulski Correctional Institution (hereinafter "Willard").  **Exs. A; E.**

The plaintiff makes the following allegations in his complaint.  He alleges that he entered the custody of the Commissioner of Correction on June 16, 2000, and was released from custody on May 26, 2002.  Comp. ¶ 10.  The plaintiff alleges that during the year 2000, he was diagnosed by "physicians employed by the Department of Correction as suffering from glaucoma which required immediate and significant medical intervention to prevent the plaintiff from going blind."  Comp. ¶ 11.  He alleges in conclusory manner as to all four defendants that they "had personal knowledge of the facts and circumstances hereinafter described but failed and refused to take reasonable and necessary steps to protect and preserve the plaintiff's eyesight."  Comp. ¶¶ 4-7.  In even more conclusory language, the plaintiff alleges that:

> [T]he defendants acted jointly and in concert with each other.  Each defendant had the duty and opportunity to protect the plaintiff from the unlawful actions of the other defendants and of other officials and employees of the Department of Correction, but each defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

Comp. ¶ 9.

The allegations in the complaint imply that the plaintiff received no medical treatment whatsoever for his glaucoma, and then one day woke up blind.  Comp. ¶¶ 11-14.  The plaintiff

then claims that the same defendants "still refused and failed to take any steps to attempt to reverse the plaintiff's blindness."  Comp. ¶ 15.

> **B.**        **Plaintiff's Deposition Testimony**

The plaintiff claims he entered the custody of the  Department of Correction on or about June 16, 2000 and was discharged on or about May 26, 2002.  Comp. ¶ 10.  This is accurate, as Department of Correction records indicate the plaintiff's most recent period of incarceration commenced on June 16, 2000 and ended May 24, 2002.  **Ex. A RT Screens.**  The plaintiff claims that "during the year 2000, [he] was diagnosed by physicians employed by the Department of Correction as suffering from glaucoma which required immediate and significant medical intervention to prevent the plaintiff from going blind."  The plaintiff claimed in his deposition that this diagnosis came "three days after I was incarcerated."  **Ex. B, Dep. 33.** Before that, he says, he "didn't know the word glaucoma." **Ex. B 95.**   The plaintiff concedes that he had developed the glaucoma prior to his incarceration and had experienced pain in his eye prior to incarceration, but that he "didn't know he had a disease" until he was incarcerated.  **Ex. B 95; see also 33.**

Despite the plaintiff's allegations in his complaint which make it sound as if he is completely blind, he clarified in his deposition that he alleges that he went blind in only one eye during his incarceration.  **Ex. B 29-30, 43-45.**  He testified with regard to his right eye:  "With reading glasses I can see pretty good so far with this eye here."  **Ex. B 30.**

The plaintiff further claims that at after this initial visit with a doctor three days after his incarceration commenced, he saw other doctors at Osborn, and those doctors informed him they saw a problem with his left eye.  **Ex. B 33.**  The plaintiff alleges that the he saw a doctor at

Osborn three or four days after he got there.  **Ex. B 91.**  He testified: "and that's when they told

me, she says, You have optical nerve –something is wrong with your optical nerve.  We need to

bring you back.  They did bring me back there."  **Ex. B 91.**

The Osborn doctor allegedly sent the plaintiff to "UConn" and the plaintiff testified "they

gave me a full eye examination at UConn."  **Ex. B 33.**  At UConn, the plaintiff alleges that he

was told by a doctor that the optical nerve in his left eye was already severely damaged.  **Ex. B

34, 109.**  The plaintiff alleges that the doctor that he saw at UConn was the defendant, Dr.

Serafini, whom he identifies as "a prison eye doctor at UConn."  **Ex. B 97.**

The plaintiff alleges that Dr. Serafini told him that if he could get the pressure down in

his eyes, laser surgery could be performed on the eye.  **Ex. B 11**.  He testifies, "They told me

they needed to get the pressure down before they could – they were going to do laser surgery on

it, Dr. Serafini told me."  **Ex. B 11.**[1]  The plaintiff repeats this testimony in his deposition:

> When I went there, they gave me a full eye examination at UConn.  …When they
> finished I asked them, Well, what's wrong?
> He said … You have an optical nerve that has been severely damaged.  He says, if it's not
> treated immediately almost, he says, it could develop a permanent blindness.  *He says, so
> your eye pressure is very high, he says, it's very high.  He says, and we can't do anything for
> you now until the pressure goes down*, but you're going to be brought back here [in] two to
> three weeks.  He signed the paper and, okay, and he says the Department of Correction will
> bring you back.
**Ex. B 33-34 (emphasis added).**

The plaintiff further testified as follows:

> Q;      Did they know what caused the optical nerve injury?
> A:      No, he didn't say at the time.  Just said my optical nerve.  He said it can
> blow.  *This is why he told me the eye pressure was too high for them to perform
> any kind of surgery*.  I told them that the doctors in New Haven said that I could
> get a surgery or something.  He said, Not at this time, he said, because your

---

[1]      The plaintiff repeated this testimony several times in his deposition.

> pressure is too high and it can blow out the other eye.  He says, I'm going to give
> you this medication to lower the level.

**Ex. B 92 (emphasis added).**

The plaintiff testified that personnel at UConn, who he believed was Dr. Serafini, "told

me they wanted to get the pressure lowered and that they had put in some kind of acquisition or

something they were saying to the board over at Osborn, they go through a review board and it

has to get approved by them."  **Ex. B 111.**

The plaintiff testified that the pressure in his left eye did come down "some", stating:

"And then when the doctor at Osborn was seeing me, he was telling me, Well, it's going down

some.  It came down some, like this here…..As soon as it came down he would get me back up

to UConn."  **Ex. B 112.**   He states with regard to doctors at UConn, "And each one of them told

me that they—that surgery was required and that they could take care of it as soon as the

pressure is down *because it's too risky for them to try*, the laser surgery could blow out the other

eye because of the pressure.  *The pressure was – stayed high here*.  And by me having high

blood pressure it was a risk too."  **Ex. B 113 (emphasis added).**

The plaintiff complains that although the pressure in his left eye often went or stayed

elevated, "they did get the eye pressure down a couple times, so the doctor at … Osborn told me,

but they just never sent me back.  They wait until it built back up again*, I guess the pressure kept

going back up, going back up."*  **Ex. B 113-14 (emphasis added).**

The plaintiff does testify that every time he went back to have his eyes examined at

UConn, his vision was getting worse, along with pain in his left eye.  "It was getting worse

because every time ….last two times I went there they told me that it was getting worse. …They

told me it was getting worse.  Every time I go there they would check my blood pressure, they

would check my eye pressure." **Ex. B 115.**  For the several months before the plaintiff alleges he

went blind in his left eye, he testifies that the pain and vision problems were quite bad.  "My pain

constantly stayed in my eye.  …Then I was really having trouble seeing.  My vision was getting

real bad." **Ex. B 115.**

The plaintiff testifies that he was told that this pain and difficulty seeing was due to

elevated pressure.  "They told me it was the pressure up around there that was swelling." **Ex. B

115.**  According to the plaintiff's own testimony, the pressure in his left eye never went down as

far as the doctors wanted it to.  "[T]he doctor in UConn would tell me the pressure went down,

because he was keeping records of my pressure up and down.  You know, he was keeping a

record.  So he would tell me – sometimes I go there, he would say, Well, it went down some,

Sam. *It should go down a little bit more."* **Ex. B 119-20.**   The plaintiff testified as follows:

"Q:   So the eyedrops weren't really helping the pressure in your eye go down?   A:  No.  …. Q:

So you think the pressure stayed high in your eye? A: yes." **Ex. B 123.**

The plaintiff claims that he always took his eyedrops, but admits that medical care

providers claimed he did not comply with his eye drop medication regimen while incarcerated.

**Ex. B 121,  46.**  He testified as follows:

> And I told him to his face, This is a lie.  He said that I lost my eyesight because I wasn't
> taking my medications like I was supposed to.  That was a lie.  What medication?  All
> they was giving me for my eye was eyedrops.  Was eyedrops.  An eye drop is not
> medication for an optical nerve injury.

**Ex. B 46.**

The plaintiff repeated that he does not consider eye drops to be medical treatment.  **Ex. B

55-56.** The plaintiff testified that at one point he went two weeks without his eyedrops but that

during that two week period he received "a substitute eye drop...So I don't know what difference it would make anyway." **Ex. B  121.**

The plaintiff alleges in his complaint, "During the year 2000 the plaintiff was diagnosed by physicians employed by the Department of Correction as suffering from glaucoma which required immediate and significant medical intervention to prevent the plaintiff fro going blind. …Throughout the years 2000 and 2001, however, the defendants and their colleagues, with the knowledge acquiescence of the defendants, knowingly failed and refused to provide the plaintiff with such **treatment."  Comp.**

The plaintiff makes broad, conclusory allegations in the complaint that the defendants were acting jointly with one another.  In his deposition, he had no specific allegations that indicated the defendants were conspiring to deprive him of the medical care to which he considered himself entitled.  As to the individual defendants, the plaintiff testified as follows in his deposition:

**1.      Dr. Serafini**

In addition to the testimony of the plaintiff regarding Dr. Serafini set forth above, the plaintiff testified:

> A:      And then the doctors at UConn told me that that was what was happening.  He told me this is why you need—we need to get you straight.
> Q:      Dr. Serafini said that?
> A:      Right.  Told me—they seemed like they were trying to help me up in UConn. They really seemed like they tried—were trying to help me.  But it seemed like there was a hold up on Osborn because of the medical—I mean whatever their procedures are with their board or directors or whatever.
> Q:      Ok.  So [it] seemed like Dr. Serafini was trying to help you?
> A:      That's what it seemed like.

**Ex. B 116.**

2.      **Jason Gaudet**

Gaudet was assigned to Osborn.  **Ex. B 66.**  The plaintiff claims, and it is not disputed that the plaintiff was very concerned about his eyesight.  **Ex. B 76-91.**  The plaintiff testified that he was in frequent contact with Gaudet, who was his counselor  **Ex. B 79.**  The plaintiff claims that whenever he spoke to Warden Strange at Osborn in the hallway, the Warden told him to go through his counselor.  **Ex. B 78-79.**  The plaintiff claimed that he did so.  He testified:  "[The Warden] told me talk to my counselor, have my counselor give him a letter. That's what I did.  Mr. Gaudette got more letters than anyone.  He was my counselor and he was right there.  Mr. Gaudette got all my requests and tried to get them to the  warden."  **Ex. B 78-79.** At another point, the plaintiff testified that the defendant Gaudet told him that as he wasn't a doctor, there wasn't anything he could do.  **Ex. B 37.**  The plaintiff has no more substantive allegations regarding the defendant Gaudet.  The plaintiff does not claim that defendant Gaudet had any control over the medical care he received.  The plaintiff does not claim that Gaudet in any way prohibited the plaintiff from making his medical appointments.

3.      **Warden Strange**

The plaintiff testifies that he spoke with Warden Strange on an almost daily basis regarding his concern for his eyesight.  **Ex. B 78.**  The plaintiff testifies that in these verbal conversations, the Warden told him, essentially, to get something in writing through his counselor, which he claims he did.  **Ex. B 78-79.**  The plaintiff also claims he wrote letters to Warden Strange but did not produce any.  **Ex. C Plaintiff's Response to Defendants' Interrogatories and Requests for Production; see also Ex. B, p. 78, request to plaintiff's**

**counsel.**  The plaintiff admits that he saw medical frequently while housed at Osborn.  **Ex. B**.[2]

He does not claim that Warden Strange had any control over the medical care he received.  The

plaintiff does not claim that Warden Strange in any way prohibited the plaintiff from making his

medical appointments.

    **4.**     **Nelvin Levestre**

    The plaintiff claims that Warden Levestre, who he concedes is black, was racist and did

not like to help people.  **Ex. B 125.**  "Seems like he don't help nobody.  He's just there for the

system and *everything has got to be by the book*."  **Ex. B 125 (emphasis added).**  He said that

Warden Levestre did not want to hear medical complaints and told the plaintiff to "put  a request

in" that is, a formal request for medical care.  **Ex. B 125.**  The plaintiff also testifies that his

daughter contacted Warden Levestre and was informed that he had checked and that the plaintiff

was not going blind.  **Ex. B 35.**  The plaintiff does not claim that he was unable to receive

medical care at Willard, where Levestre was Warden, nor does he claim that Levestre had any

control over the medical care the plaintiff received.  The plaintiff does not claim that Warden

Levestre in any way prohibited the plaintiff from making his medical appointments.

    Warden Levestre, at one point the Warden of the Willard facility, was only the Warden

for the plaintiff from late April 2001 until late July 2001.  During this period of time, the plaintiff

saw medical personnel, including Dr. Serafini, on numerous occasions.  **Exs. A; D.**  As a non-

medical professional, Levestre is entitled to rely on the medical judgment of professionals tasked

---

[2]    Here is a list of plaintiff's references to receiving medical care while at Osborn as
contained in his deposition:  1)  "I got the glasses while I was incarcerated at Osborn."  **Ex. B 32;**
2)    "I was told by the doctors at the Osborn facility that they would have to send me to
UConn."  **Ex. B 33;**   3)    He saw Dr. Smyth when at Osborn.  **Ex. B 82;**  4)  Osborn

with providing medical care to inmates.  There is no allegation Levestre ever impeded the plaintiff's ability to obtain medical care in any way.

5.      **Medical History Since Release From Incarceration**

As to his right eye which was functional at the time of plaintiff's deposition, the plaintiff testified that while incarcerated, he received eye drops for his right eye and that this preserved his right eye.  **Ex. D DOC Medical Records 10-11, 119.**  He testified that he saw a doctor upon his release who informed him that his right eye also has glaucoma and told him that "laser surgery can *sometimes* open, can work on it."  **Ex. D 25.**  The plaintiff has not had surgery for either eye, although he has been discharged for over two years.  **Ex. D 25-26.**  The plaintiff has never had surgery to "reverse" the damage to his left eye.  **Ex. D 25-26.**  He was given eyedrops after his release for the right eye, and he took them until the first bottle ran out, but no longer takes them.  **Ex. D 26.**  This is despite the fact that the doctor who the plaintiff saw after his release told him that "as long as he keeps it wet" his right eye may not get any worse, and that laser surgery might only be a "possibility."  **Ex. D  29.**

C.      **Plaintiff's Documented Medical History**

1.      **References to Time Previous to Last Period of Incarceration**

The parties agree that the plaintiff most recently entered Department of Correction custody on June 16, 2000.  Comp. ¶ 10.  The plaintiff had been incarcerated before that, from April of 2000 until June 7, 2000, as well as on previous occasions.  **Ex. A**.  Despite the plaintiff's

---

doctors did send him to UConn more than once.  **Ex. B 91;  see also Ex. B at 98, 112, 113, 117.**  References to frequent medical care are replete in the medical records.  **Ex. D.**

claim that he had never heard the word glaucoma in his life before his most recent incarceration, there are several references in his DOC medical chart to previous diagnoses.[3]

The plaintiff was incarcerated on various occasions in 1999.  **Ex. A**.  At an intake screening on March 1, 1999, the plaintiff an intake nurse  at NHCC noted in the plaintiff's medical chart that he had "[increasing] blurred vision L eye.  wears no glasses.  told 1 yr. ago diag. [diagnosed] c/ [with] Glaucoma and takes no meds."  **Ex. D 42.**  On March 3, 1999, the plaintiff signed an Authorization form for release of medical information to the Hospital of St. Raphael's Eye Clinic.  **Ex. D 149.**  The plaintiff initialed a line that states "Eye Clinic (Glaucoma)".   **149.**  His signature on the bottom of the form is witnessed.  **Ex. D 149.**

On March 1, 1999, a nurse at NHCC made a note in the plaintiff's chart that his Intake had been completed.  **Ex. D 251.**  In addition to various other issues, the nurse noted that the plaintiff had been put on Dilantin for another condition and had not taken the medicine for a year.  **Ex. D 251.**  She then noted, "He c/o [complains of] [increasing] blurred vision L eye and diagnosed c/ [with] glaucoma 1 yr. ago + was given script and return appt. and never filled or return for appt."  **Ex. D 251.**

As **Exhibit A** indicates, the plaintiff was in and out of DOC custody in the 1999.  He entered custody on January 22, 1999 and was discharged to bond three days later.  **Ex. A**.  He was not held from the end of January 1999 until March 1, 1999, when he was reincarcerated for two weeks until March 15, 1999.  **Ex. A**.  He then spent 2 ½ months on his own, re-entering custody on June 30, 1999, and staying again for only a couple of weeks.  **Ex. A**.  He was readmitted in November of 1999, and this time stayed until February of 2000.  **Ex. A**.  In April

---

[3]     Despite defendants' requesting "outside" medical records, the plaintiff has not yet

of 2000 he was again placed in custody, where he stayed until June 7, 2000.  **Ex. A**.  He was

released then until June 16, 2000 when his final period of incarceration began.  **Ex. A**.  The

comings and goings of plaintiff prior to his final incarceration created inherent difficulties for the

plaintiff in a regular course of care by persons providing care to inmates.  These difficulties are

not and cannot be attributed to the defendants.[4]

The earliest reference to glaucoma in the plaintiff's medical chart is in 1996 when the

plaintiff was not incarcerated and went to the Emergency Room at the Hospital of St. Raphael

complaining of blurry vision in his left eye.  **Ex. D 164-68.**   In a record included in the chart

dated November 2, 1996, the plaintiff complained of "Lt Eye Pain".  **Ex. D 164.**  He reported "2-

3 days dull pain L eye assoc. c/ some blurring of vision and halos around lights.  Denies

prev[ious] vis[ion] problems.  No glasses.  Denies trauma."  The physician's assessment was "?

incipient [just beginning] glaucoma"  **Ex. D 165.**  The patient was instructed to see an

---

provided any to defendants.

[4]     Medical professional working with the plaintiff during his previous periods of incarceration did examine the plaintiff's eyes and provide related medical care.  On March 8, 1999, a request for outside health services was made by a doctor for the purpose of treating the plaintiff's glaucoma.  **Ex. D 204.**  The patient discharged, however, on March 15, 1999.  **Ex. A**. The plaintiff had seen an optometrist on March 3, 1999.  **Ex. D 205.**  On May 15, 2000**,** the plaintiff fell "[secondary] to [decreasing] visions s/ subsequent loss of balance [and] begun on [eyedrops to decrease pressure twice daily].  **Ex. D 240.** At that time, the plaintiff told the healthcare practitioner that there had been no previous exam related to glaucoma.  **Ex. D  240.** Eyedrops were prescribed and administered to the plaintiff.  **Ex. D 316, 318, 321.**  Follow-up care was recommended, but again the plaintiff's period of incarceration ended.  **Ex. D 240; Ex. A.**  The healthcare practitioner apparently thought s/he had "begun" the plaintiff on eyedrops on May 15, 2000, but the plaintiff had received a prescription for eyedrops two weeks earlier.  **Ex. D 241, note for 5/1/00.**

"opthamal[ogist] in am." **Ex. D 165.** The discharge summary indicated that the patient was "Discharged by MD/PA With MD/PA Instructions." **Ex. D 168.**

The plaintiff's medical chart includes a Utilization Review Request dated May 8, 2000 and faxed on May 15, 2000 by a Dr. Arnista at NHCC. **Ex. D 152.** The request is for the plaintiff to receive an ophthalmology consult. **Ex. D 152.** The request states, "Patient seen for an exam. Been told (@ Yale) of glaucoma, with ? laser or surgical treatment recommended. Exam revealed severe optic nerve damage." **Ex. D 152.** The chart includes a facsimile transmission report dated 5/15/00 to "URC-Denise". **Ex. D 154.** Dr, Arnista's notes also state on May 8, 2000 "Glaucoma—surgery or laser recommended (@ Yale) pt [patient] didn't follow up." **Ex. D 153.** These notes are important as they precede the plaintiff's final period of incarceration. **Ex. A.**

### 2.      Utilization Review Committee

Since the mid-90s, the University of Connecticut Health Center "UCHC" has contracted with the Department of Correction to provide healthcare for persons within the  custody of the Commissioner of Correction. **Ex. E, Serafini Aff.** UCHC created "Correctional Managed Health Care" as the entity responsible for providing direct care to inmates. **Ex. E.** Correctional Managed Health Care has established a "Utilization Review Committee". **Ex. E.** In order for an inmate to receive a consultation with a medical care provider outside the facility in which he is housed, or to receive certain procedures such as surgery, the Utilization Review Committee ("URC") must approve care proposed by an on-site physician. **Ex. E.** An opthamology consult for an inmate requires approval by the URC, as would any eye surgery. **Ex. E.**

If URC denies treatment, a doctor cannot override URC's decision.  **Ex. E**.  Custodial staff, such as Wardens and Correctional Counselors, have no input into the URC decision-making process as they are not qualified medical professionals.  **Ex. E**.  URC is a committee made up solely of licensed healthcare practitioners.  **Ex. E**.  Dr. Serafini was never on the Utilization Review Committee during the plaintiff's final period of incarceration.  **Ex. E**.

### 3.     Most Recent Term of Incarceration

As noted above, the plaintiff entered Department of Correction custody for the final time on June 16, 2000.  **Ex. A**.  He was admitted to NHCC for about three weeks, and then transferred to Osborn, where he stayed from July of 2000 until April of 2001.  **Ex. A**.  In early August of 2000, the plaintiff saw an optometrist at Osborn, Dr. J. Smyth.  **Ex. D 197.**  Dr. Smyth completed a request to the "URC" or "Utilization Review Committee " on August 7, 2000.  **Ex. D 196-97, 203.**  The request indicated that the plaintiff was "not currently being treated" for glaucoma.  **Ex. D 196.**

URC approved the request  on August 11, 2000, and Dr. Pillai, M.D. noted the action required, which was transportation to "UCHC OPD".  **Ex. D 196.**  The Committee instructed "Please send YNHH [Yale New Haven Hospital] records with patient at time of visit."  **Ex. D 196.**   The plaintiff saw a Dr. Jeanine Suchecki[5] in the Opthamology Department at UConn on September 12, 2000.  **Ex. D 189.**  Dr. Suchecki stated, "Disc'd options.  Needs follow up 2 mo." **Ex. D 189.**  Dr. Suchecki diagnosed the plaintiff at this time with "advanced glaucoma."  **Ex. D 189.**  Dr. Suchecki recommended two kinds of eyedrops to be taken twice daily.  **Ex. D 189.**

---

[5]     The plaintiff seems to confuse Dr. Suchecki at UConn with Dr. Serafini who treated him on-site at Willard.  **Exs. A; B; D; E.**

Pharmacy records indicate that Dr. Pillai, the on-site physician, then prescribed two kinds of eyedrops for the plaintiff in a prescription lasting from September 14, 2000 until November 12, 2000. **Ex. D 19.** The optometrist, Dr. Smyth, followed up with the plaintiff on October 27, 2000. **Ex. D 238.** She noted "pressures better but still unsatisfactory. *Discussed patient compliance with drops in AM.*" **Ex. D 238 (emphasis added).**

There is no indication in the medical records that the plaintiff received his 2 month follow-up visit, which would have been in November of 2000 while the plaintiff was at Osborn. A reminder was faxed to URC on October 26, 2000 regarding the requested follow-up visit, but no response from URC is indicated. **Ex. D 237.** While it is not clear why this follow-up did not occur, there is no indication that at this point in time, November 2000, that either Dr. Serafini or any of the other three defendants were even remotely aware of the plaintiff's eye condition. Dr. Serafini had not yet seen the plaintiff, and there is no indication the plaintiff was sufficiently concerned at this time that he was seeking help from any source regarding his eyesight. Dr. Pillai was the doctor following the plaintiff's general care while he was incarcerated at Osborn. **Ex. E**. Moreover, even had they wanted to, none of the defendants could authorize care at UConn; only URC could do so. **Ex. E.**

The following month, December of 2000, "Debbie CHN [Correctional Head Nurse] noted that a follow-up was required for the plaintiff to see an ophthalmologist regarding his glaucoma. **Ex. D 191.** It was noted that this follow-up was "booked." **Ex. D 191.** Dr. Pillai saw the plaintiff on December 11, 2000, and advised him to continue the two eye drop medications. **Ex. E  237.** In another month, January of 2001, the plaintiff still had not had his follow-up, and so the optometrist, Dr. Smyth, filed a Utilization Review Request, noting: "58 y

o black male with advanced glaucoma.  Last seen by opthamology 9-12-00 with a 2 month

follow-up needed.  Has not had 2 month follow-up visit—Follow-up necessary."  **Ex. D 200.**  It

was noted in the Clinical Record on January 5, 2001, "MD to write URC for follow-up opthal.

Appt.  Will book for Dr. Smyth for eval."  **Ex. D  237.**

 Dr. Pillai filed URC requests for an  opthamology consult on January 16, 2001 as well as

January 8, 2001.  **Ex. D 186, 202.**  Both were denied with instruction to Dr. Pillai to refer the

patient to Dr. Smyth and to note the patient's history of medication compliance.  **Ex. D  186,**

**202.**  Dr. Smyth filed another request a week later noting the results of her optometry exam and

stating, "Pt [patient] c/o [complains of] almost complete loss of vision OS [left eye]."  **Ex. D**

**185.**  This request was approved.  **Ex. D 185.**  Dr. Smyth noted that the medication prescriptions

had been renewed.  **Ex. D 185.**

 For a reason not apparent in the record, the opthamology appointment was not conducted

until April of 2001, which was still before the plaintiff was transferred to the Willard facility.

**Ex. D.**  This was before Dr. Serafini treated or examined the plaintiff for any purpose and before

any correspondence to any custodial defendant the plaintiff has produced.  **Exs. A; B 178-80**; **C.**

Indeed, in April 2001, the plaintiff asked to see a medical supervisor not with regard to treatment

for his eyes but for the purpose of seeking a reduction in his Medical Treatment Needs Score in

the DOC classification system.  **Ex. D 156.**  This reduction was denied given the plaintiff's

extensive medical history, including the fact that the plaintiff was "followed by UConn" for his

glaucoma.  **Ex. D 156.**

 When the plaintiff was seen by the UConn ophthalmologist on April 17, 2001, before his

transfer to Willard, the specialist, again Dr. Suchecki, determined that the plaintiff was not taking

his eyedrops properly.  **Ex. D 178-80; 340.**  The plaintiff's "IOP", intraocular pressure, was "too high".  **Ex. D 340.**  The plaintiff's eye drop prescription was adjusted and a two-month follow-up was planned.  **Ex. D 340.**  As the plaintiff was still at Osborn, Dr. Pillai reviewed and signed the treatment plan.  **Ex. D 340.**

Within days of seeing the plaintiff, Dr. Suchecki completed a URC request seeking a two-month follow-up for the plaintiff.  **Ex. D 178-80.**  URC's response was directed to Dr. Pillai: "Dr. Pilai to refer to on-site optometrist for f/u [follow-up].  Also, increase medical monitoring of compliance with glaucoma meds (patient not using appropriately per ophthalmologist.)"  **Ex. D 178-80.** [6] This response from URC was noted by Dr. Pillai on May 4, 2001, a few days after the plaintiff was transferred to Willard on April 30, 2001. **Exs. A; B 179.**   URC was notified of the plaintiff's transfer to Willard on or near May 1, 2001.  **Ex. D 36.**  Also on May 1, 1001, a nurse noted in the chart "Request for opthamology Cl[inic] faxed to URC."  **Ex. D 228.**

Dr. Serafini reviewed the plaintiff's chart on May 22, 2001, signing off on the URC response on that date.  **Ex. D 178.**  Dr. Serafini noted in the chart that he had reviewed the URC orders on May 22, 2001. **Ex. D 228.**  This is the first time that Dr. Serafini had any contact with the plaintiff or his case.  **Ex. D**.  Eight days later, on June 1, 2001, Dr. Serafini examined the plaintiff.  **Ex. D 228.**  On this date, Dr. Serafini reviewed the plaintiff's medication compliance with him.  **Ex. D 228.**  Also on this date, Dr. Serafini noted that the "Plan" for the plaintiff was to follow up with opthamology.  **Ex. D 228.**  At this time, Dr. Serafini estimated the plaintiff's vision to be almost completely gone in notes made on the left side of the chart.  **Exs. B p. 228;**

---

[6]     The plaintiff had compliance issues with other medications as well.  **See, e.g. Ex. D 161.**

**E.**  Dr. Serafini also noted at the time that the glaucoma was several years old and that there were no changes since April of 2001.  **Exs. B 228; E.**

At the time the plaintiff was due for his opthamology follow-up as per the ophthalmologist, Dr. Serafini re-submitted the URC request previously submitted by Dr. Suchecki for the opthamology clinic appointment.  **Ex. D 17, 177, 357.**  Dr. Serafini faxed to URC an optometry report indicating the plaintiff was reporting his compliance with the medication regime.  **Ex. D 356.**  This request was again denied.  **Ex. D 177, 360.**

The URC referred the patient to the facility optometry clinic at Osborn on June 21, 2001, essentially denying the request for an opthamology exam.  **Ex. D 177.**  On July 17, 2001, the plaintiff was transferred back to Osborn for a week period before being sent back to Willard on July 24, 2001.  **Ex. A**.  Osborn has a more extensive medical unit.  **Ex. E.**  The plaintiff had fallen and was sent for evaluation and monitoring.  **Ex. D 225, 228, 281-83.**  A week after that, the plaintiff was again transferred, this time to Gates Correctional Institution ("Gates").  **Ex. A.**[7] The Medical Transfer Summary form completed on July 30, 2001, indicates that another URC request for an UConn opthamology was sent in July, 2001.  **Ex. D 35.**  When the plaintiff arrived at Gates, it was noted in his chart that he "denie[d] any acute medical or MH [mental health] issues a this time."  **Ex. D 35.**

The plaintiff was back at Osborn on July 17, 2001 when Dr. Pillai filed an additional URC request for an opthamology follow-up with attachments.  **Ex. D 351.**  Dr. Pillai filed another URC request with attachments on July 18, 2001.  **Ex. D 17, 352-54.**  He also ordered an

---

[7]    Gates is a low security level facility where inmates are often transferred in the period leading up to their discharge from prison.  **Ex. E.**

optometry appointment for the plaintiff at this time and prescribed a four month supply of eyedrops for the plaintiff.  **Ex. D 16.**

Dr. Serafini again saw the plaintiff at Willard and again submitted a URC request for opthamology care for the plaintiff on July 27, 2001.  **Ex. D 181-83, 224.**  Dr. Serafini noted that the plaintiff had been seen by optometry as per URC's last instruction.  **Ex. D 183.**  Dr. Serafini marked this request "Urgent" and circled the work "urgent."  **Ex. D 183.**  This request was also denied, but the denial went to Gates, as the plaintiff had been transferred there.  **Ex. D 349.**  Dr. Serafini was not assigned to Gates at that time.  **Ex. E**.

On July 31, 2001, a nurse at Gates saw the plaintiff and took a health history from him, noting that he was on medications for glaucoma.  **Ex. D 49, 221.**   The nurse referred the plaintiff the plaintiff to the optometry clinic.  **Ex. D 221.**  She noted, "URC request was faxed from previous facility for UConn opthamology.  Will place eye gtts [drops] on line as previous facility stated I/M inmate was non-compliant."  **Ex. D 221.**

The nurse's note on July 31, 2001 at Gates makes clear that Dr. Serafini was no longer responsible for the plaintiff's overall medical care:  "Case was discussed c/ Dr. Wagner and Charge Nurse who will contact URC for disposition of this urgent request."  **Ex. D 221.**  A different doctor ordered additional eyedrops on July, 31, 2001**. Ex. D  12.**

At Gates, the plaintiff suddenly suffered a cardiac episode and was sent to Lawrence and Memorial Hospital from August 9 through August 13, 2001. **Exs. A; B 98-145, 292.**  The last time Dr. Serafini had any part in the plaintiff's health care was the URC request in late July, 2001. **Ex. D 305.**  The plaintiff transferred out of Willard on July 30, 2001 and never returned.

**Ex. A.** Obviously, other doctors continued to see the plaintiff for various issues and to prescribe medication. **Ex. D 10, 301-03, 306, 308-09, 311, 350, 386-95, 406-409.**

After his hospital stay, the plaintiff was returned to Osborn for the remainder of his incarceration until May 2002. **Ex. A**. As stated above the defendant, Dr. Serafini, was not responsible for patients at the Osborn. **Ex. E.** The plaintiff was at Willard only a short period of time, and during that time, Dr. Serafini made several efforts to help the plaintiff, making URC requests on a repeated basis. **Ex. E.**

Upon his return to Osborn from the hospital after his cardiac incident, the plaintiff was initially housed in a medical ward, "Ward 9" so that his cardiovascular function could be monitored. **Ex. D 215.** At this point, the primary focus of the plaintiff's medical care shifted to his cardiac well-being. **Ex. D 209-215, 346-47.** The plaintiff was not compliant with the monitoring and care recommended for his heart. **Ex. D 209, 212-13.**

The plaintiff was continued on eyedrops through November. **Ex. D 309, 310, 313.** In November, the plaintiff indicated he had run out of eye drops and more were ordered. **Ex. D 302, 350, 395.** The plaintiff saw the optometrist in both November and December of 2001. **Ex. D 395.** In December of 2001, the plaintiff was admitted to the infirmary at Osborn for back pain after a fall in the dining hall. **Ex. D 401.** On December 15, 2001, it was noted that the plaintiff's left eye was slow to react to light. **Ex. D 9.** He was also seen several times in December by Mental Health staff for various issues, none of which were his deteriorating eyesight. **Ex. D 405.** Dr. Pillai and Dr. Smyth continued the plaintiff's medications. **Ex. D 407-408, 410.**

In January of 2002, the plaintiff was back in general population and reported "sudden onset" loss of vision in his left eye. **Ex. D 343, 390.** It was at this point that a family member

20

got involved.  **Ex. D 393, 6.**  It is not until this point, after the plaintiff perceived his left eyesight to be gone, that medical records reflect the plaintiff became very concerned about his right eyesight remaining.  **Ex. D 393, 7, 8.**

The plaintiff then saw Dr. Smyth, who requested an opthamology evaluation to control the pressure and preserve the vision "OD", that is, in the patient's right eye.  **Ex. D 343.**  The plaintiff's "almost total loss of vision" was confirmed in the left eye, but had been noted as such in the left eye on previous dates.  **Ex. D 344, 185.**  When Dr. Smyth did a URC request in January of 2002, URC noted in its response that the patient was reporting almost total loss of vision, but "URC notes loss of vision OS [left eye] since 1/01 per UR data."  **Ex. D 342.**  Nonetheless, URC approved the visit to an opthamologist.  **Ex. D 342.**

The plaintiff saw an opthamologist, Dr. Ehlen, on February 27, 2002.  **Ex. D 335.**  A return visit to the opthamologist was approved by URC in March of 2002.  **Ex. D 335-37.**  The day after the plaintiff saw the opthamologist at UConn, he reported to a nurse,  "I just wanted to let you know the end of the story.  I'm 100% blind in this eye and *the pressure is too high in this eye for laser surgery.*"  **Ex. D 391** (emphasis added).  The plaintiff was seen by medical staff in five times in January and February, in March of 2002, and three times in April of 2002**.  Ex. D 39**1.  It was in February of 2002 that the plaintiff reported to medical staff that he "Has written to everyone possible—anxiously awaiting a trip to UConn, worried about the status of his *R* eye."  **Ex. D 392 (emphasis added).**

The plaintiff was seen again by an opthamologist in April, who recommended a specialist evaluation at Yale New Haven Hospital.  **Ex. D 328**.  Vision tests were conducted on the plaintiff in May of 2002, shortly before his discharge that month.  **Exs. B 329-30; A**.

Dr. Blanchette offers the following opinion, after reviewing the plaintiff's medical records:

> Given the intraocular pressure in the plaintiff's left eye, given the advanced stage of the glaucoma, and given the irreversible damage to the optical nerve, either traditional or laser surgery to treat the plaintiff's glaucoma during his last period of incarceration would have been unsuccessful. The attendant risks of the surgery would have outweighed any potential benefit.

**Ex. F.**

Wardens Levestre and Strange and Counselor Gaudet, who are undisputedly custodial rather than medical personnel, were responsible, within the scope of their duties, for custodial duties related to the plaintiff. They were not, however, overseeing his medical care nor were they personally involved in it.

### III.   ARGUMENT

#### A.   Standard of Review

Summary judgment is appropriately granted when evidentiary records show that there are no genuine issues of *material* fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett,* 477 U.S. 317, 323, 324 (1986).

While the Court must view the facts presented in the light most favorable to the party opposing the motion, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a Motion for Summary Judgment." *Knight v. U.S. Fire Ins. Co.,*

804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932 (1987).   Additionally, "mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1990).   Once the movant has met his burden, "the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir. 1995).

### B.    Plaintiff's Claim of Inadequate Medical Care Fails

#### 1.    Applicable Law

Under the Eighth Amendment, sentenced inmates are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety."  *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520 (1979); *Lareau v. Mansan*, 651 F.2d 96, 106 (2d Cir. 1981); *see also Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (Supreme Court noted that Eighth Amendment imposes certain duties on prison officials, to "ensure that inmates receive adequate food, clothing, shelter and medical care), quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) and *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) (Court held that only those conditions depriving inmates of the 'minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." ).

In order to state a cause of action for unconstitutional denial of medical care, an inmate must allege "deliberate indifference to [his] serious medical needs."  *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  "A complaint that a physician has been negligent in diagnosing or treating a

medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id*. at 292. The conduct complained of must "shock the conscience" or constitute a "barbarous act." *McCloud v. Delaney,* 677 F. Supp. 230, 232 (S.D.N.Y. 1988), *citing U.S. ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970). A claim by an inmate against a treating physician is only cognizable if the alleged conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward*, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982), *quoting Estelle*, *supra*, 429 U.S. at 104-105. A defendant must have acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) *cert. denied sub nom Foote v. Hathaway*, 513 U.S. 1154 (1995).. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmates health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exist, and he must also draw the inference.'" *Id*., *quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

There are both subjective and objective components to the deliberate indifference standard. *Id.* The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) The term "serious medical need" contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway, supra,* 37 F.3d at 66, *quoting, Nance v. Kelley,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting.))

Subjectively, the prison official must have acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin, supra*, 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate's health or safety; the official must both be aware of fact from which the inference could

24

be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.,*

*quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  In *Estelle, supra,* the Supreme Court

implicitly acknowledged the obvious limitations in holding non-medical personnel liable for an

alleged lack of medical care:  "Prison guards" can be held liable not for overriding the decisions

medical professionals but for "intentionally denying or delaying access to medical care or

intentionally interfering with the treatment *once prescribed*."  *Estelle, supra,* 429 U.S. at 104-105

(emphasis added)(footnote omitted).  Only URC could prescribe outside visits or surgery, and

the prison staff did not have the expertise to second guess the medical necessity for such.

**2**.        **Applying the Appropriate Standard, No Deliberate Indifference**

The defendants in this case concede that glaucoma is a serious medical need.  They do

not concede, however, that they failed to address or disregarded this serious medical need in the

plaintiff.   The mere fact that plaintiff went blind in his left eye while in custody does not mean

that he did not receive appropriate medical care  Since medical staff were routinely providing

various forms of care to the plaintiff, the three custodial defendants did not disregard the

plaintiff's medical needs.  They could not have drawn the inference that the medical care being

provided to the plaintiff was inadequate as they do not possess the training or expertise to believe

medical staff was acting inappropriately.  Most importantly, the plaintiff cannot bear his burden

with regard to causation given Dr. Blanchette's testimony that the plaintiff was not ever a good

candidate for surgery, that the risks of surgery outweighed the potential benefit, and that the

surgery would have been unsuccessful given the advanced stage of the plaintiff's long-untreated

illness and given the intraocular pressure within his left eye.  It is telling that at the time of his

deposition nearly two years after his discharge, the plaintiff had never had surgery for his remaining eye which has glaucoma and was not treating it even with eye drops. **Ex. B.**

a.    Dr. Serafini

Dr. Serafini, while never noting in any medical record that he felt surgery was in order, did seek opthamology consultations for the plaintiff and did seek a non-formulary medicine, all in the limited time that he treated the plaintiff. Thus, he certainly did not disregard any medical need of the plaintiff, and, most certainly, his behavior as described above does not "shock the conscience." After Dr. Serafini sought an opthamology consult for the plaintiff, the plaintiff was no longer under his care. Lack of care when a patient is an inmate in another facility cannot form the basis for deliberate indifference. *Hernandez v. Keane,* 341 F.3d 137, 146 (2d Cir. 2003).

Moreover, the treatment the plaintiff now claims he was entitled to "was risky to begin with" and "entailed the risk of doing more harm than good." *Id.*; see **Blanchette Affidavit, Ex. F**. Thus, the decision of whether or not to perform laser or traditional surgery on the plaintiff's damaged left eye was "purely an issue of medical judgment." *Id.* at 146-147. "This is precisely the sort of issue that cannot form the basis of a deliberate indifference claim." *Id.*, citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) (contrasting deliberate indifference with the exercise of medical judgment). Moreover, the Ninth Circuit has held in the context of a deliberate indifference claim that, in the treatment of glaucoma, eye drops are an acceptable alternative to laser surgery. *Martinez v. Kunimoto,* 1993 U.S. App. LEXIS 11693 (9th Cir. 1993), *cert. denied*, 510 U.S. 1180 (1994), attached.

Even if the Court feels Dr. Serafini's medical judgment was negligent in the treatment of plaintiff's glaucoma, there is no evidence that Dr. Serafini's mind state was one of deliberate indifference.  *O'Banner v. Bizzell,* 1998 U.S. App. LEXIS 17685 (7th Cir. 1998), attached.  The fact that Dr. Serafini continued to submit URC requests and marked the last one urgent indicate that his mind state was not indifferent at all.  He did not receive the response as the plaintiff had transferred to another facility.

The plaintiff cannot even hope to sustain his burden that any of the medical care he received violates the Constitution.  As the sought-after surgery was risky and unlikely to be helpful, the Constitution does not require it.   Most importantly,  the care provided by Dr. Serafini during the four month period the plaintiff was within his purview was certainly constitutionally sound.

        b.      <u>Custodial Defendants Could Rely on Medical Professionals</u>

Although the plaintiff feels that he should have received different medical treatment than the treatment medical staff provided to him, it cannot be disputed that he did in fact receive medical care on a frequent basis while he was incarcerated for a variety of issues including his vision.  The custodial defendants are entitled to defer medical judgments to medical professionals, and the Constitution does not require that they second-guess such professionals. *See, e.g., Waples v. Kearney,* 2001 U.S. Dist. LEXIS 9050 (D. Del. 2001), attached;  *Cross v. Ayers,* 1998 U.S. Dist. LEXIS 16546 (N.D. Cal. 1998), attached.  "Prison administrators … cannot be found deliberately indifferent for failing to defer to an inmate's judgment about appropriate diagnostic care" when medical professionals are providing an inmate care and making alternative decisions about that care. *Fillerbrown v. Zettlemoyer,* 1996 U.S. Dist. LEXIS

11495 (D. Penn. 1996), attached, citing *Estelle v. Gamble,* 429 U.S. at 107; *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir. 1993). When custodial staff's participation in the medical care of an inmate is "remote" and "attenuated", a claim for deliberate indifference fails. *Miltier v. Beorn,* 896 F.2d 848, 855 (4th Cir. 1990); *Rogers v. Evans,* 792 F.2d 1052, 1059 (7th Cir. 1986). One Court has stated, "*Miltier* has stated, and common sense confirms, that [a Warden's] reliance [on medical professionals] cannot amount to deliberate indifference." *Coppage v. Mann,* 906 F. Supp. 1025 (E.D.Va. 1995).

When in this district, Judge Cabranes ruled, "[A]s a prison administrator, [the] Warden … justifiably may defer to the medical expert[s] regarding treatment of inmate/patients." *Liscio v. Warren,* 718 F. Supp. 1074, 1082 (D. Conn. 1989), *reversed on other grounds,* 901 F.2d 274 (1990), *citing, McEachern v. Civiletti,* 502 F. Supp. 532, 534 (N.D.Ill. 1980)(reliance upon opinion of medical staff as to proper course of treatment insulates prison administrator from liability under the Eighth Amendment). This is especially so when prison administrators do not have the authority to order surgery or other sought-after treatment. *Gomm v. DeLand,* 729 F. Supp. 767, 781 (D. Utah 1990).

In this case, comprehensive medical and mental health care were being provided to the inmate through the contract with UConn and the entity Correctional Managed Health Care. **Ex. D.** The plaintiff cannot show that the custodial staff in this case had any reason to doubt the care being provided to inmates when the plaintiff made visits to medical constantly and received all sorts of care and medicine on a consistent basis. None of the three custodial defendants were deliberately indifferent to the plaintiff's medical needs.

### C.    Defendants Did Not Have Personal Involvement

28

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws." *Rizzo v. Goode* 423 U.S. 362, 370-71 (1976), *quoting* 42 U.S.C. §1983. Where damages are sought in a §1983 action, the defendant(s) must be responsible for the alleged constitutional deprivation. Thus, an allegation of personal involvement is a necessary prerequisite for a valid cause of action under § 1983. *See, e.g., Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973), *rev'd on other grounds, Graham v. Connor*, 490 U.S. 386 (1989); *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). Consistent with the requirement that personal involvement is required for a claim under § 1983, the Supreme Court has ruled that the general doctrine of *respondeat superior* does not suffice to state a claim under § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692-95 (1978). Thus, in order to state a cognizable claim, the plaintiff must allege, and ultimately prove, "personal involvement of [the defendants] sufficient to support their liability for wrongful acts," not merely their "linkage in the chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).

Supervisory responsibility alone is not enough to confer exposure to liability. *Williams v. Smith*, 781 F.2d 313, 323 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). A supervisory official may only be liable if it is alleged that he or she learned of the violation and failed to remedy the wrong, if he created or permitted the policy or wisdom under which the unconstitutional practices occurred, or if he was grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d at 323-24; *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir. 1989). "A plaintiff must thus allege a tangible connection between the acts of the

defendants and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). For example, an official cannot be held liable merely because he or she occupies a high position in the prison hierarchy. *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).

### 1.    Custodial Defendants

In this case, none of the custodial defendants are even alleged to have been personally involved in the choice of medical care for the plaintiff. Moreover, Dr. Serafini's Affidavit makes clear that custodial staff are not involved in medical decision making such as a decision to provide surgery or not, notwithstanding their obvious duty to make sure inmates have access to medical care. **Ex. E.** By virtue of the common sense proclaimed by the defendant Gaudet, "I am not a doctor", the custodial defendants were not personally involved in the decisions plaintiff complains of nor do they possess the education, background and training to even question the care provided to plaintiff with regard to his eyesight.[8]

The custodial defendants are not accused of interfering with medical treatment or with denying it. They were not sufficiently involved, despite plaintiff's conclusory allegations to the contrary, and summary judgment should be rendered in their favor. *See Hardy v. Aguinaldo,* 2003 U.S. Dist. LEXIS 9706 (N.D.Ill 2003), attached; *Joyner v. Greiner,* 195 F. Supp.2d 500 (S.D.N.Y. 2002).

### 2.    Dr. Serafini

---

[8]    This is true also notwithstanding the plaintiff's claims that the defendant Warden Levestre supposedly told a family member that appropriate care was being provided to the plaintiff and that the plaintiff was not going blind. This alleged behavior has no causal link to the decisions being made regarding the plaintiff's sight, and there is no allegation the Warden did not, in fact, receive such a report from medical staff.

The same argument applies to Dr. Serafini. Dr. Serafini provides a sworn statement to this Court in his Affidavit that he was not the decision-maker with regard to the plaintiff's medical care. **Ex. E**. Even supposing, for the sake of argument, that surgery would have helped the plaintiff despite Dr. Blanchette's Affidavit, Dr. Serafini did not receive the final denial of the request for an opthamology visit from URC. **Exs. B; E**. As Dr. Serafini's care of the plaintiff was limited to the four months time the plaintiff spent at Willard, Dr. Serafini also lacks the requisite personal involvement for this case to be submitted to a jury on the issue of liability.

### D.    All Defendant are Entitled to Qualified Immunity

The doctrine of qualified immunity protects government officials from civil suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir. 1995); *Oliviera v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S. 1076 (1995). This doctrine evolved as an accommodation between the need to provide private redress when government officials abuse their position of public trust and the need to shield officials who responsibly perform their duties from the costs of defending an action. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald,* 457 U.S. at 814. Assertion of the privilege should be upheld unless the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640. The doctrine of qualified immunity for government officials does not serve only as a defense from liability, but also *to dismiss* an action prior to the commencement of discovery when the plaintiff has failed to claim the violation of clearly

established law or to allege the clear violation of a constitutional right.  *Behrens v. Pelletier,* 516 U.S. 299, 306 (1996); *Jermosen v. Smith,* 945 F.2d 547, 553 (2d Cir. 1991), *cert. denied,* 503 U.S. 962  (1992).

The Supreme Court requires a two-tiered approach on the issue of qualified immunity, first, to determine of a constitutional violation has occurred, and only if a Court determines that such a violation has occurred does it consider whether qualified immunity protects the defendants nonetheless.  *Wilson v. Layne,* 526 U.S. 603, 609 (1999).  As the preceding discussion makes clear, none of the defendants violated the Eighth Amendment with regard to the plaintiff's medical care.  Even if this Court finds to the contrary, all of the defendants are entitled to qualified immunity as they did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

### IV.    CONCLUSION

For all the foregoing reasons, the defendants respectfully move this Court for summary judgment in their favor.  The plaintiff's own deposition testimony makes clear that the pressure in his left eye always made surgery risky.

DEFENDANTS,
DR SERAFINI ET AL
RICHARDBLUMENTHAL
ATTORNEY GENERAL


BY:____/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us




## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following on this 20th day

of October 2004:

John Williams, Esq.
Williams & Pattis
51 Elm St., Suite 409
New Haven, CT
06510



___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General